IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARMANDO HERNANDEZ, MICHAEL WANDS, JOE ALVAREZ, BALMORES ORTIZ, DAVID RODRIGUEZ, LUIS TEJADA, CHAD GOURLEY, JOSEPH GASDIA, PAUL GASDIA, ERIC CLEVELAND, JASON DIXON, ERIC BOLISKI, ERIC MAHANEY, RICHARD PITNEY, ELIJAH NAYLOR, AND SEAN NEARY, Individually and on Behalf of All Others Similarly Situated, As Class Representatives,<br><br>Plaintiffs,<br><br>v.<br><br>C&S WHOLESALE GROCERS, INC., RICHARD "RICK" B. COHEN, and C&S WHOLESALE GROCERS, INC., as Plan Administrator<br><br>Defendants. | CIVIL ACTION NO. 06-CV-2675 (CLB) (MDF) |

JOINT DECLARATION OF STEVEN L. WITTELS, JEREMY HEISLER, AND
DAVID W. SANFORD IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION
FOR (1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT; (2)
ATTORNEYS' FEES AND LITIGATION EXPENSES; (3) SERVICE PAYMENTS TO
VARIOUS CLASS MEMBERS; AND (4) ENTRY OF JUDGMENT

Steven L. Wittels, Jeremy Heisler, and David W. Sanford state as follows under the penalty

of perjury, pursuant to 28 U.S.C. §1746:

      1.      Steven L. Wittels and Jeremy Heisler are co-founding partners in the New York City

office of Sanford Wittels & Heisler, LLP. David Sanford is a founding partner in the Washington,

D.C. office of Sanford Wittels & Heisler, LLP. Messrs. Sanford, Wittels, and Heisler are joint Lead

Counsel for Plaintiffs and the Settlement Classes preliminarily approved by Judge Charles L.

Brieant on February 25, 2008, amended by Judge Brieant's Supplemental Order Regarding

Preliminary Approval of Settlement on March 14, 2008.[1]  Based on Messrs. Sanford's, Wittels',

and Heisler's active participation and supervision in all material aspects of the prosecution and

settlement of this action, they have personal knowledge of the matters set forth in this certification,

unless stated otherwise.

   2.  Messrs. Sanford, Wittels, and Heisler make this Declaration in support of

Plaintiffs' motion for (a) final approval of the class action settlement, with a Maximum Gross

Settlement Amount of $14,000,000, plus additional prospective relief; (b) attorneys' fees in the sum

of $4,390,826.23 **and** expenses of $694,465.97; (c) service payments to the class representatives

and other class members who assisted in the prosecution of this litigation; and (d) entry of the

proposed Judgment and Order of Dismissal with Prejudice.[2]

<u>Introduction to the Proposed Settlement and Relief Sought by this Motion</u>

   3.  Plaintiffs' motion seeks final approval of the Settlement of this wage and hour class

action that comes after over two years of active litigation; massive discovery; hard-fought arm's

length negotiations; multiple mediation sessions before an experienced mediator, the Honorable

Nicholas H. Politan, United States District Court Judge for the District of New Jersey (*retired*); and

extensive settlement practice and administration.

   4.  After many months of rigorous negotiations as well as disputes over settlement

drafting and administration, the parties reached a Settlement Agreement, which the Court

preliminarily approved as fair and reasonable on February 25, 2008.  Plaintiffs now submit this

Agreement for final approval.  The proposed Settlement creates a Maximum Gross Settlement

Amount of $14,000,000, including attorneys' fees and costs to Plaintiffs' Counsel and $400,000 in

incentive fees to Named Plaintiffs and other class members.  Eligible class members will receive

cash payments based upon the number of weeks worked during the relevant period.  In addition,

---

[1] See Exhibit 2 to Appendix of Exhibits ("Appendix"), Order Preliminarily Approving the Class Settlement and Supplemental Order Regarding Preliminary Approval of Settlement.

[2] See Exhibit 1, [Proposed] Final Judgment and Order of Dismissal with Prejudice.

Defendant C&S has agreed to and has instituted comprehensive measures ensuring that all class members (incentive piece-rate workers) employed by the Company will receive the hours and compensation to which they are entitled (we note that Defendant C&S has denied and continues to deny that its prior policies resulted in underpayments to class members).   As confirmed by accounting experts BDO Seidman, the benefits made available under the Settlement Agreement represent a substantial percentage – approximately 40-50% – of C&S' maximum potential exposure were litigation to proceed.  (See accompanying Certification of Glenn Pomerantz, CPA, in Support of Final Approval)

5.      In arriving at this favorable resolution, Plaintiffs and Class Counsel recognized the expense and length of a trial and potential appellate process, and further acknowledged that both class certification and success on the merits remained uncertain.  Class Counsel recognized the potential problems of proof regarding the claims asserted in this action.  Therefore, Plaintiffs and Counsel determined the Settlement to be in the best interest of Plaintiffs and the Settlement Classes. The benefits of the Settlement – including effective prospective relief – present immediate and tangible value that might not otherwise be achieved, or be entangled in years of complex litigation.

6.      Following Judge Brieant's preliminary approval of this settlement, the Claims Administrator mailed over 12,000 full-form notices with claim forms to potential class members, of which 11,700 were reported as deliverable.  (See July 6 Weekly Statistics Report of Claims Administrator, attached as Ex. A to Certification of Jennifer M. Keough Regarding Mailed Notice and Claims Administration)  In response to this mailing, the Administrator received claim forms from 2,978 class members (a return rate of approximately 25%), who collectively claimed over 50% of the work weeks available for compensation through the settlement (303,970 out of 589,431 weeks).  (Id.)  In contrast, there were **zero** objections and only four requests for exclusion (a minuscule .034% opt-out rate), none of which registered any dissatisfaction with any aspect of the settlement.  (Id.)  This overwhelmingly positive reaction of the class confirms experienced Class

3

Counsel's and BDO Seidman's independent judgment as to the fairness, reasonableness, and adequacy of the settlement provisions, forming a unified triumvirate in support of the final resolution of this matter.

7.       In accordance with applicable law and the strong judicial policy in favor of class action settlements, (see accompanying Memorandum of Law), Plaintiffs now ask the Court to approve this mutually desired and highly beneficial conclusion.

I.       **Background of the Litigation and Settlement**

(A)      **Early 2006— Pre-Complaint Investigation**

8.       In early 2006, Defendant C&S was the second-largest food wholesaler and the eighth largest privately-held corporation in the United States.  C&S had warehouses in at least sixteen states and employed over 12,500 warehouse workers.

9.       In early 2006, Plaintiffs' Counsel commenced a comprehensive investigation and analysis of alleged wage and hour violations at C&S facilities in numerous states – particularly with regard to those warehouse employees compensated by the Company on an incentive piece-rate basis.  Counsel's investigation included multiple client interviews and meetings, document review, and detailed legal research on the application of the Fair Labor Standards Act ("FLSA") and state labor laws and regulations to the facts emerging from the investigation.

10.      During the course of this extensive investigation, and thereafter, Class Counsel were contacted by additional Class Representatives in various states, engaged local counsel, selected and consulted with eminent forensic accounting and wage and hour experts, and drafted detailed and exhaustive factual allegations and legal claims.

(B)      **April 6, 2006— Initial Complaint**

11.      Plaintiffs Armando Hernandez, Michael Wands, Michael Rodrigues,[3] and Joe Alvarez – current and former workers at C&S' facilities in New York State – filed the initial

---

[3] Michael Rodrigues is no longer a named plaintiff in this action.

4

complaint in this action on April 6, 2006.  On behalf of a class of incentive piece-rate workers, Plaintiffs contended that C&S had violated and continued to violate the FLSA and state labor laws in a variety of ways, including:

    a)  failing to pay employees for all time worked "off-the-clock" (i) before and after shifts and (ii) during meals and rest periods when employees are performing tasks that are integral to the employees' job duties;

    b)  failing to correctly calculate and pay employees an "overtime" premium for working more than forty (40) hours in a week;

    c)  unilaterally deciding to pay workers at a lower rate than that agreed upon;

    d)  making unlawful deductions from employees' wages as punishment for worker errors, worker injuries and/or worker tardiness or absences (resulting in lowered pay under so-called "Disciplinary Rates"); and

    e)  failing to compensate New York employees an additional hour's pay for each hour worked in excess of 10 hours per day ("spread of hours" rule).

Plaintiffs' allegations involved a complex and sophisticated payroll system where workers were paid per piece for their primary work, and were paid an hourly rate (based upon their average hourly earnings for the previous eight weeks) for other productive time as well as vacation, holiday, sick, and personal pay.

**(C)**    **May-June 2006– Collective Action Declarations/Plaintiff Boliski's State Wage Complaint**

12.    In May-June 2006, Plaintiffs and numerous class members – approximately 24 individuals in total – filed declarations stating that they had been denied the full compensation and overtime pay owed to them by C&S and consenting to be parties to a collective action under the FLSA, 29 U.S.C. § 216(b).  These C&S incentive workers thereby "opted-in" to the federal claims asserted in the complaint.

13.    In addition, on approximately May 19, 2006, Named Plaintiff Eric Boliski filed a formal Wage Complaint with the Massachusetts Attorney General.

**(D)**   **June 15, 2006– First Amended Complaint– Plaintiffs File 31-Count**
         **Multi-State Action**

14.     After the Complaint was filed, C&S workers from all over the country contacted Plantiffs' counsel to relate their experiences as warehouse workers for the giant grocery wholesaler. Based on these wide-ranging interviews, nine more C&S workers who had worked in five states in addition to New York joined the case as additional class representatives.  On June 15, 2006, Plaintiffs Armando Hernandez, Michael Wands, Joe Alvarez, Balmores Ortiz, David Rodriguez, Luis Tejeda, Chad Gourley, Joseph Gasdia, Paul Gasdia, Eric Cleveland, Jason Dixon, and Eric Boliski – Named Plaintiffs and Class Representatives who worked at C&S' facilities in New York, Connecticut, Pennsylvania, Maryland, Vermont, and Massachusetts – filed an amended complaint. This complaint refined Plaintiffs' factual and legal allegations and added state claims under the labor laws and regulations of the five additional states.

15.     The First Amended Complaint – brought on behalf of seven subclasses – included two counts under the FLSA, six counts under New York labor law, five counts under Connecticut labor law, four counts under Pennsylvania labor law, four counts under Maryland labor law, five counts under Vermont labor law, and five counts under Massachusetts labor law.  Plaintiffs sought to maintain a collective action under the FLSA, 29 U.S.C. § 216(b), and to certify a class action pursuant to Fed. R. Civ. P. 23 under the laws of the six states.  Plaintiffs further sought class-wide damages, attorney's fees and litigation costs, pre- and post-judgment interest, and equitable relief.

**(E)**   **June-July 2006– Initial Pretrial Conference and**
         **Scheduling Order/ Early Discovery**

16.     On May 26 and June 8, 2006, in advance of the upcoming Initial Pretrial Conference, Plaintiffs sent to C&S' counsel drafts of a joint proposed Civil Case Discovery Plan and Scheduling Order.  At the Conference on June 16, 2006, Judge Brieant set a schedule for discovery and motion practice on class certification issues.

17.     On or about June 26, 2006, Plaintiffs served their First Set of Interrogatories

Related to Class Discovery.  Plaintiffs served two related sets of Document Requests on or about June 30, 2006 and July 14, 2006.

18.     In July 2006, the parties further served upon each other various deposition notices pursuant to Fed. R. Civ. P. 30(b).  Plaintiffs sought to depose designated corporate representatives with knowledge of C&S' labor practices; Defendants served deposition notices on the twelve Named Plaintiffs as well as eleven opt-in class members.  Plaintiffs' Counsel commenced additional research regarding the propriety of Defendants' subpoenas, conferred with subpoenaed individuals, and began to prepare the class members for their depositions.

(F)     July 24, 2006– Defendants' Answer to First Amended Complaint

19.     Defendants filed their Answer to the amended complaint on July 24, 2006.  Defendants denied all relevant allegations in the complaint and further denied all liability and any entitlement of the Plaintiffs and class members to damages or other relief.

20.     In addition, Defendants raised the following affirmative defenses, among various others: 1) failure to state a claim upon which relief may be granted; 2) Plaintiffs were in fact given all required overtime compensation, as well as meal and rest periods; 3) statute of limitations; 4) Plaintiffs' claims are barred by applicable provisions of the Portal-to-Portal Act, 29 U.S.C. § 259; 5) Plaintiffs' claims are barred by exemptions and exclusions contained in the FLSA, 29 U.S.C. § 207, and corresponding state law; 6) Plaintiffs falsely reported their hours without the knowledge of C&S and are estopped from raising their claims; 7) Defendants acted in good faith, with reasonable justification for believing that their actions comported with the law; 8) res judicata; 9) estoppel; 10) waiver; and 11) unclean hands.  In addition, Defendants asserted that Plaintiffs could not establish the requirements for a class action pursuant to Rule 23 or a collective action under the FLSA.

21.     Defendants requested that the Court dismiss Plaintiffs' complaint with prejudice and deny all claims for relief, and further requested that the Court award reasonable attorney's fees and costs associated with their defense of this action.

7

**(G)**     **July 24, 2006– Maryland State Complaint**

22.     On July 24, Plaintiffs Joseph Gasdia and Paul Gasdia – workers at C&S'
warehouse in Aberdeen, Maryland – filed a separate class action suit in the Circuit Court for
Harford County, Maryland, reiterating their various wage and hour allegations.

23.     Plaintiffs' Counsel – in collaboration with various local counsel – also drafted four
additional state wage and hour complaints on behalf of class representatives who worked in C&S'
facilities in Connecticut, Pennsylvania, Vermont, and Massachusetts.  This was done to cover the
possibility that the Court might decline to certify a multi-state class.

**(H)**     **July-October, 2006– Preliminary Steps Towards Mediation**

24.     The parties held a two-day meeting on July 24 and July 27, 2006 to discuss the
issues in the case, discovery matters, and the potential mediation of Plaintiffs' claims.  During the
course of these discussions and thereafter, Plaintiffs' Counsel drafted proposals for mediation –
including mediation-based discovery and exchange of data – and a proposed mediation plan.

25.     At the July 27 meeting, Defense counsel presented a memorandum of law
asserting that reductions of its incentive employees' piece-rates are legal and justified under the
labor laws of the six relevant states as long as they are implemented prospectively rather than
retroactively.  Defendants continued to deny all other factual and legal allegations.  In addition to
thorough ongoing research on the class' various federal and state claims, Plaintiffs' Counsel
proceeded to perform extensive research and analysis in response to Defendants' legal arguments.

26.     On August 8, 2006, the parties signed a tolling agreement stipulating that the
statute of limitations on Plaintiffs' and the class members' FLSA claims and the claims under the
labor laws of the six states be tolled until further notice.

27.     In consultation with its wage and hour expert, Brian Farrington, former Assistant
Director in the United States Department of Labor, Wage and Hour Division, and forensic
accounting experts BDO Seidman, Plaintiffs' Counsel developed a comprehensive six-step

mediation plan and proposal for Defendants' consideration, including a sampling plan for C&S' payroll and wage and hour data. Following various proposals and counter-proposals, the parties met again on September 5 and September 21, 2006 to discuss matters regarding the potential mediation of this action and related discovery and data exchange. The parties continued to negotiate the terms of the mediation and to exchange further proposals.

**(I)     October 16, 2006-- Mediation Agreement**

28.     On October 16, 2006, the parties executed a detailed seven-step mediation agreement referring all claims to mediation before Judge Nicholas H. Politan and setting forth a comprehensive pre-mediation discovery plan, including a representative sample of data from Defendants' timekeeping systems and accounting records and deposition-style interviews of Named Plaintiffs and opt-in FLSA collective action plaintiffs. Moreover, in recognition of the August 8 tolling agreement, Plaintiffs officially agreed not to file any further state claims during the mediation process. To avoid complex multi-state issues, the parties agreed to proceed with the mediation under New York law.

29.     As a result, the Court agreed to temporarily cancel all litigation deadlines. Furthermore, the Circuit Court in Maryland adjourned proceedings in the *Gasdia* case.

**(J)     Mediation-Based Discovery and Discovery Disputes**

30.     For purposes of mediation-based discovery, the agreement organized data and document production into five subclasses: (i) the Disciplinary Rate Subclass; (ii) the Off-the-Clock Subclass; (iii) the Overtime Subclass; (iv) the Agreed-Upon Rate Subclass; and (v) the Spread of Hours Subclass. While Defendants agreed to produce a relevant data sample on subclasses (ii) and (iii), they did not consent to immediate discovery on the remaining subclasses. Instead, the parties would continue to try to resolve issues surrounding these categories through the exchange of legal and/or factual memoranda and would refer any unresolved disputes to the mediator.

31.     Plaintiffs filed their First Set of Pre-Mediation Discovery Demands on October 20,

9

2006, seeking detailed punch card reports for the Named Plaintiffs and other FLSA opt-in plaintiffs. On October 23, 2006, Plaintiffs filed a Second Set of Pre-Mediation Discovery Demands, requesting discovery – including records, data, and interviews of C&S personnel – to enable Plaintiffs and their experts to prepare a sampling plan in accordance with the mediation agreement.

32.     Defendants provided responsive data on December 1 and December 7, 2006; Plaintiffs' Counsel interviewed Keith Martin, a former payroll manager and Director of Finance for C&S, on December 18 and received further documents.

33.     On or about December 22, 2006, Plaintiffs submitted a Memorandum of Law in Support of Pre-Mediation Discovery on Deduction Claims (subclass (i)) to defense counsel. Plaintiffs argued that C&S' wage deduction system – under which incentive piece-rate employees were penalized for their own errors as well as those of their coworkers – was unlawful under the labor statutes and corresponding case law of the six relevant states and that C&S could not get around this body of law by creatively relabeling its practices as prospective modifications. Plaintiffs distinguished the precedents cited in Defendants' earlier memorandum on this issue and urged C&S to produce data regarding these claims.

34.     Plaintiffs' Counsel filed a third set of data and document requests on January 16, 2007. The parties held a meeting regarding pre-mediation discovery issues on January 17, 2007, which the Plaintiffs followed up with a letter on January 19.

35.     Defendants produced supplementary documents on January 30, 2007 and the parties held an additional meeting on February 6, 2007 and conference call on February 7 as well as further discussions and negotiations. In conjunction with expert accountants BDO Seidman, Plaintiffs developed a sampling plan for C&S' payroll and other wage and hour records and data. Furthermore, Plaintiffs' Counsel interviewed C&S managers and payroll officials regarding its payroll system and wage and hour practices.

36.     Following production of the data sample and other pertinent information,

Plaintiffs' Counsel and their experts conducted a comprehensive analysis of Defendants' liability and the class' potential damages.

37.     From approximately January through September 2007, more than forty class members provided sworn Declarations in support of the class' allegations and the various claims asserted in this action.   In addition, in March 2007, Defendants conducted deposition-style interviews of several Plaintiffs and declarants, which Plaintiffs' Counsel attended.   Plaintiffs' Counsel extensively prepared class members for these interviews.

38.     On March 27, 2007, Defendants submitted to mediator Politan a Pre-Mediation Reply Memorandum of Law in response to Plaintiffs' December 22 memorandum on the wage deductions claim.   Plaintiffs submitted an opposing memorandum, consisting of thorough factual and legal analysis as well as twenty attached exhibits including the class members' Declarations and interview excerpts.

39.     On May 8, 2007, Plaintiffs' Counsel submitted additional detailed and comprehensive pre-mediation discovery requests.

**(K)     May 16, 2007– Pre-Mediation Meeting**

40.     On May 16, 2007, the parties conducted a full-day pre-mediation meeting during which their respective experts presented competing analyses of the class' claims and potential damages.

**(L)     Production of Expert Reports on Liability and Damages**

41.     In June 2007, following extensive document review and consultation with counsel, Plaintiffs' wage and hour experts, BDO Seidman and Brian Farrington, BDO's Mr. Pomerantz and his team prepared an expert report and PowerPoint presentation regarding C&S' liability for wage and hour violations.   Both BDO and Mr. Farrington continued to revise their reports with additional facts emerging from discovery and BDO's analysis of Defendants' time records and other data.

42.     In addition, BDO continued to evaluate C&S' payroll data and, in accordance with

Plaintiffs' and Mr. Farrington's legal analysis, to develop its calculation of the class' potential damages.

**(M)      August 7, 2007-- Preliminary Mediation**

43.      On August 7, 2007, the parties held a meeting with mediator Politan at defense counsel's offices in Newark, NJ to discuss various matters in the case, including Plaintiffs' legal claims, outstanding discovery issues, and class certification issues.

44.      Following the meeting, the parties sent a letter to Judge Politan memorializing their agreement on discovery and scheduling matters.  Defendants agreed to provide all additional discovery materials by August 17, including further data samples relating to Plaintiffs' wage deduction claim (discovery subclass (i)) and agreed-upon wage claim (discovery subclass (iv)). Furthermore, the parties set a schedule for a full mediation in October 2007.

**(N)      Related _Mahaney_ Case in the District of Connecticut**

45.      On August 7, 2007, Plaintiffs Eric Mahaney, Richard Pitney, Elijah Naylor, and Sean Neary filed a related complaint in the United States District Court for the District of Connecticut, raising substantially similar allegations and claims.

46.      On August 31, Plaintiffs' Counsel made a motion to stay the _Mahaney_ action pursuant to the first-to-file rule; Defendants opposed.  On September 18, 2007, in light of this rule as well as the parties' tolling agreement and pending mediation, counsel for the _Mahaney_ plaintiffs agreed to stay duplicate causes of action; hence, counsel petitioned the Connecticut court for an extension of time to serve the complaint on C&S.

**(O)      September 2007-- Pre-Mediation Submissions to Judge Politan**

47.      On September 25, 2007, Plaintiffs submitted their mediation statement expounding their factual and legal positions in this action and attaching 70 exhibits – including statutes, regulations, and case law in support of their claims; numerous Declarations by the class members; documents regarding C&S wage and hour policies; and certain payroll data and analysis.

48.     Plaintiffs informed the mediator that this litigation had engendered a great deal of "bad blood" and that it had seemed that the parties would never actually sit down in mediation. Plaintiffs advised that they did not intend to settle on the cheap.

49.     In advance of the final round of mediations, the parties further submitted competing damages calculations to mediator Politan.  Defendants estimated the class' total damages at $658,242, even if liability were fully established; using Plaintiffs' disputed damages assumptions, Defendants placed their maximum exposure at approximately $24,227,409.  Plaintiffs' experts, BDO, using a limited sample of payroll data, calculated C&S possible liability at approximately $28,920,521-$62,699,343, excluding liquidated damages and interest.

**(P)     October 1 & 3, 2007– Mediation With Progress Toward Settlement**

50.     On October 1 and 3, 2007, the parties engaged in two full days – approximately 20 hours – of mediations before Judge Politan.  At the mediation, the parties continue to hotly contest issues concerning both liability and damages, as well as the propriety of class-based treatment of this action.  Furthermore, the parties' experts, particularly Plaintiffs' wage and hour authority Brian Farrington, significantly participated in mediation discussions.

51.     With Judge Politan's assistance, the parties succeeded in crystallizing the issues for mediation purposes and moving closer to a range of settlement.  During the mediation and in further in-person and telephone negotiations, the parties began to sketch out the basic parameters of a settlement – including a Maximum Gross Settlement Amount, claims process, and affirmative relief in the form of changes in C&S' wage and hour policies.

**(Q)     October 9, 2007– Follow-up Meeting With Mediator Politan and *Mahaney* Counsel Regarding Facilitation of Global Settlement**

52.     On October 9, 2007, Plaintiffs' Counsel and Co-Counsel met before Judge Politan to attempt to fold the *Mahaney* case into the settlement and to achieve a global resolution of all claims against C&S.  Counsel began to formulate an agreement along these lines, which was finalized after further discussions.

**(R)** **October-December 2007– Further Settlement Discussions; Tentative Settlement and Memorandum of Agreement**

53.      The parties engaged in additional arm's-length negotiations throughout October and November 2007, including telephone conversations with mediator Politan, to hammer out details regarding the proposed settlement and devise specific settlement terms.  On November 9, 2007, the parties held a full-day settlement meeting, during which the majority of the terms of the settlement were resolved.

54.      On November 16, 2007, the parties informed Judge Brieant that they had reached a settlement.   After numerous additional discussions, the parties recorded their agreement in a Memorandum of Agreement executed on December 27, 2007.

**(S)** **December 2007-February 2008– Settlement Drafting; Resolution of Additional Settlement Issues**

55.      Between December 2007 and February 2008, the parties exchanged numerous rounds of drafts of the Settlement Agreement and resolved significant issues regarding the language and content of the settlement terms.   The parties signed and executed the final Settlement Agreement on February 19, 2008, and further drafted and agreed upon mailed notice and claim forms to the class members (including Spanish language versions for Spanish-speaking class members) and proposed preliminary and final approval orders.

## II.      Description of the Settlement Benefits

### A.      $14,000,000 Maximum Gross Settlement Amount

56.      In recognition of the class members' claims for past damages, the Settlement creates a Maximum Gross Settlement Amount of $14,000,000, including attorney's fees and expenses and service payments to the Named Plaintiffs and other class members who actively assisted in the litigation and bringing the settlement to fruition. The Settlement provides that class members submitting claim forms receive awards based upon the number of weeks worked as piece-rate workers during the relevant period.

57.     The monetary settlement, facilitated by Judge Politan, represents a fair and reasonable compromise of the parties' mediation positions. Under Plaintiffs' damages estimates for settlement purposes ($28,920,521-$62,699,343), the Maximum Gross Settlement Amount represents approximately 22.3 to 48.4 percent of what the class members should have received in compensation *if all* of their allegations (including claims under federal law and the laws of six states for unpaid hours and overtime and impermissible wage deductions) were wholly substantiated. The Maximum Gross Settlement Amount also equals approximately 57.8% of Defendants' high calculation, taking Plaintiffs' claims as wholly substantiated ($24,227,409), as well as approximately 112.5% of the average ($12,442,825.50) of Defendants' estimations of the class' actual damages ($658,242) and maximum potential damages ($24,227,409) – representing more than $1.55 million in class relief above the $12,442,825.50 midpoint figure (50% of $658,242 plus $24,227,409).

**B.     Substantial Policy Changes at All C&S Facilities**

58.     In response to this litigation, C&S has implemented substantial corrective measures. In approximately December 2006, Defendants formulated new written wage and hour policies preventing unpaid labor before and after shifts and during lunch breaks as well as any other off-the-clock work.[4] Following the mediation and settlement, C&S formalized its policy changes in detailed and comprehensive written wage and hour rules. Pursuant to the settlement, class members presently employed by C&S must certify that they have been given copies of these current policies and that they agree to follow such policies and to report any violations.

59.     The prospective relief instituted as a result of the efforts of Named Plaintiffs and Class Counsel remedies a large if not a total measure of the class members' potential damages if C&S' disputed labor practices continued. Under these new rules, class members will receive the requisite compensation for all hours worked, including any overtime. The monetary value of these

---

[4] Plaintiffs' Counsel reviewed and made revisions to C&S' new policies and procedures prior to their implementation.

measures to the class is considerable.

## III.   Post-Settlement Activities

### A.   Preliminary Approval of Settlement

60.     On February 21, 2008, Plaintiffs submitted preliminary approval papers and supporting materials to the Court seeking preliminary approval of the settlement and the issuance of notice to the class members.

61.     Judge Brieant granted all requested relief on February 25, 2008, preliminarily approving the settlement as fair and reasonable under the circumstances; preliminarily certifying the proposed settlement classes; and directing that notice be issued to the class.

### B.   Second Amended Complaint

62.     In accordance with the global resolution of this litigation, Plaintiffs filed their Second Amended Complaint on February 25, 2008 in order to encompass the *Mahaney* claims into the action.[5]  The complaint now included 34 causes of action under the FLSA, ERISA, and labor laws and regulations of the six relevant states.

63.     Defendants filed an Answer to the Second Amended Complaint on March 5, 2008, denying all pertinent allegations and claims for relief and raising twenty-four distinct affirmative defenses.

### C.   Claims Process– The Class Responds Positively to the Settlement

64.     Following Judge Brieant's preliminary approval order, the Claims Administrator mailed the approved notice and claim forms to 12,159 potential class members.  459 of these claims packets were ultimately reported as undeliverable, leaving 11,700 individual class members who presumably received mailed notice of the settlement.  (See Certification of Jennifer M. Keough Regarding Mailed Notice and Claims Administration, and Ex. A)

65.     As of July 6, 2008, the Claims Administrator received claim forms from 2,978

---

[5] Accordingly, the *Mahaney* case was dismissed without prejudice on March 4, 2008

class members, or approximately 25% of the class.  According to data provided by the Claims Administrator, these 2,978 class members collectively claimed over 50% of the work weeks compensable through the settlement.  (Id.)  Due to the disproportionate number of weeks claimed in comparison to the number of claim forms, as well as other available data regarding the class, Class Counsel have reason to believe that many of the class members who chose not to submit claims worked for C&S for short periods of time (often less than a month) and thus have a lessened interest in the settlement.  The data additionally demonstrates that the class members with the highest stake in the litigation – those who worked at C&S the longest – tended to submit claim forms: the 2,978 claimants worked an average of approximately two years during the class period (current C&S employees among these claimants worked an average of approximately three-and-a-half years).

66.    In Class Counsel's experience, the claims rate – considering either the 25% class member response or the 50%-plus of benefits claimed – is unusually high for this type of litigation and indicates the class' strong support for the settlement.

67.    In contrast, there were *no* objections to the settlement and only four requests for exclusion (a infinitesimal .034% opt-out rate), none of which raised substantive issues regarding the settlement terms.  (Id.)  The complete lack of objections and miniscule number of opt-outs is remarkable in a case of this magnitude.

D.    **BDO's Analysis of the Settlement Benefit and Claims Data Confirms the Value of the Settlement to the Class**

68.    Following the claims process, Plaintiffs' expert forensic accountants, BDO Seidman, re-evaluated the settlement given the claims data and other information from the Claims Administrator.  These experts concluded that the settlement fund provides a substantial benefit to the class members which is fair, reasonable, and adequate under the circumstances.  Under its "solidly-grounded" damages analysis, BDO Seidman estimates that the cash relief available through the settlement represents approximately 40-50% of C&S' potential maximum liability at trial.  Furthermore, in BDO's estimation, the prospective measures instituted by C&S present

17

considerable additional value to the class, and "will likely be worth at least several million dollars to the class members over a five-year period." (See Pomerantz Cert.)

69.     In addition, using the claims data, BDO calculated the average awards to individual class members – which comprise an initial allocation based on the number of weeks worked as well as the distribution of a portion of unclaimed monies.[6]  Under BDO's estimates, the 2,978 claimants will receive an approximate mean award of $1,720, while the 1,118 current C&S employee-claimants will receive an approximate mean award of $3,000.  BDO concluded that these individual benefits "represent a reasonable and substantial resolution" of class members' claims. (Id.)

## IV.     Compelling Reasons Why the Settlement Warrants Final Approval

### A.     The Settlement – Achieved Through Hard-Fought and Protracted Arm's-Length Negotiations Overseen by Judge Politan – Creates a Substantial and Valuable Benefit for the Class

70.     This Settlement was the product of extensive meetings, arm's-length negotiations, and analysis by experienced Class Counsel.  This intensive process involved over 100 hours of face-to-face negotiations and mediations from July 2006 to November 2007, including two all-day mediation sessions before Judge Politan and additional settlement discussions facilitated by Judge Politan.  Further litigation would have reduced the amount of resources available, resulting in the Settlement Classes obtaining substantially less.  The Settlement represents a successful resolution of complex claims against Defendants, which was achieved only after Class Counsel undertook considerable efforts as described above.  Class Counsel have no reason to believe that additional settlement talks would result in any greater recovery by the class, but instead would merely duplicate its efforts, as well as those of the Claims Administrator; delay the long-awaited relief to the class; and again plunge this matter into a morass of doubt.

---

[6] With this combined figure, the claimants will collectively receive over five-eighths (62.5%) of the available cash benefit remaining after the deduction of various fees and expenses as well as the proposed incentive awards.

**B.**  **The Settlement Results are Endorsed by Experienced Class Counsel, Prominent Accounting Experts, and Courts Throughout the Country in Similar Cases**

71.     Class Counsel is experienced in both wage and hour and class action law, has been approved as class action counsel in numerous state and federal class actions, and believes the settlement is fair, reasonable, and adequate to the Settlement Classes.  In addition, an experienced expert accounting firm performed an independent analysis of the settlement and also believes it to be fair, reasonable, and adequate.  Furthermore, as set forth in the accompanying Memorandum of Law, the class benefits achieved through this litigation compare favorably with settlements approved by other courts in similar actions.

**C.**  **The Risks and Burdens of Continued Litigation- Including the Possibility of Six Separate State Actions**

72.     The Settlement reached is especially favorable when compared with the likelihood of success on the merits and the burdens of protracted proceedings, both on the litigants and on the courts.  The legal and factual issues before the Court in this case are complex, and, if fully litigated, will likely result in protracted litigation, appeals, and continued uncertainty as to outcome.

73.     As asserted throughout mediation and negotiations, as well in the Settlement Agreement and in Defendants' Answer to the Second Amended Complaint, Defendants dispute all material allegations of fact and law in this case and deny any liability to Plaintiffs or any class member.  If the litigation proceeded, in addition to continuing to assert various defenses to the claims asserted in this action, Defendants were likely to marshal arguments – already raised before the mediator – against class certification.  Given the relatively small individual damages involved in this case, the potential denial of certification would likely have prevented the class members from obtaining relief, or any relief as significant as that obtained by this settlement.

74.     Furthermore, Defendants agreed to consolidate the separate actions in this matter for purposes of settlement and achieving a global resolution of claims.  However, if the litigation went forward, there is a significant possibility that separate trials would be required in each

19

jurisdiction – requiring prodigious amounts of labor and significant duplication of the parties' efforts and resources, straining the judicial system, and risking conflicting results.[7]  If the litigation process resumed immediately, Class Counsel estimates that each of these trials would be at least two years away.

> **D.    The Class Members Have Resoundingly Approved the Settlement**

75.    The class has raised a unified voice in favor of the settlement – both through the high response rate and complete lack of opposition to the settlement terms.  No one knows better than Plaintiffs and class members themselves the calculus of trading risk, uncertainty, and delay for resolution and an immediate tangible benefit.  In opting for the latter, the class has evaluated and endorsed the reasonableness, fairness, and adequacy of the cash relief and prospective measures obtained on its behalf as well as the prospect of achieving closure.

76.    As firmly established by precedent, the overwhelming positive reaction of the class to the settlement strongly favors approval.  (See Memo of Law)

**V.    Reasons For Granting The Plaintiffs' Fee and Expense Request**

> **A.    Plaintiffs' Fee Application Seeks a Reasonable Percentage of the Maximum Gross Settlement Amount, Which    Results in a Lodestar Multiplier Considered Relatively Low by Courts in this Circuit and Nationwide**

77.    The Settlement Agreement provides for Class Counsel's litigation expenses as well as attorneys' fees in the amount of 33% of the Maximum Gross Settlement Amount remaining after the reimbursement of such expenses as well as certain other settlement costs.  In prosecuting this litigation, Plaintiffs' counsel have incurred $694,465.97 in expenses.[8]    They now move for

---

[7] Barring a global settlement, it is further possible that there would have been two separate wage and hour actions proceeding against C&S in Connecticut.

[8] See Exhibit 10, Itemized Case Expenses incurred by Sanford Wittels & Heisler, LLP and Madsen, Prestley & Parenteau, LLC in connection with Hernandez, et. al. v. C&S; Exhibit 12 Calculation of Attorneys' Fees and Expenses Pursuant to Settlement Agreement.

$4,390,826.23 as attorneys' fees.[9] The attorneys' fee request represents slightly over 31 percent of the monetary value of the $14,000,000 in cash relief made available by the settlement.  The fees requested are entirely consistent with awards in other cases; in fact they are less than percentages typically approved by courts.  (See Memo of Law, Point II).  Moreover, even this reasonable percentage discounts the value of the substantive policy changes achieved through this litigation.

78.     Plaintiffs' attorneys and staff expended more than 6,000 hours over more than two years in spearheading this lawsuit to a successful culmination.  The "lodestar" to date (time expended, multiplied by hourly rates) equals $3,019,733.50.  These hours were reasonably expended and result in an average hourly rate of $502.44.  Plaintiffs' requested multiplier of 1.45 is considered "modest" under the norms of this Circuit, and is "at the lower end of the range of multipliers" typically awarded by courts.  (See Memo of Law, Point II).

79.     The fee request does not include compensation for future services to be performed, including attendance at the fairness hearing and responding to class members' further inquiries.

80.     Despite the extensive efforts required to reach this Settlement, there remained substantial work remaining to be done if the litigation went forward – including motion practice on collective action status and class certification and other issues, additional discovery and analysis, trial preparation and one or more trials (possibly in multiple jurisdictions), and potential appeals.  Class Counsel estimates that the case is at least two years away from trial.  Thus, barring a successful settlement, Class Counsel's lodestar would increase dramatically and the proposed multiplier would likely evaporate.  The attorney's fee in this case should encourage settlement at this stage of the litigation, particularly given the lack of assurance that further proceedings would produce any greater recovery.

### B.     The Qualifications of Plaintiffs' Attorneys

81.     Steven Wittels graduated from The University of California at Berkeley (Berkeley

---

[9] See Exhibit 11, Bill and Time Records for Services Rendered by attorneys and staff of Sanford Wittels & Heisler, LLP and Madsen, Prestley & Parenteau, LLC; Ex.12, Calculation of Attorneys' Fees and Expenses.

Law) in 1984 with highest honors on his class action thesis.  After graduation from Berkeley Law, Mr. Wittels began practicing class action litigation.  Mr. Wittels has been a member in good standing of the New York State bar since 1984 and the bar of the Southern and Eastern Districts of New York since 1985.  (See Class Counsel Qualifications, attached hereto as Exhibit 3)

82.      Jeremy Heisler graduated *magna cum laude* from Brooklyn Law School in 1979 where he was an editor of the Law Review.  Mr. Heisler was an Appellate Law Assistant for the Appellate Term, First Department during 1980-1981.  Mr. Heisler has been a member in good standing of the New York State bar since January 1980 and the bar of the Southern and Eastern Districts of New York since March 1980.

83.      David Sanford graduated from Stanford Law School in 1995.  He served as law clerk for District of Columbia United States District Court Judge Gladys Kessler from 1995 through 1996.  He has been a member in good standing of the Maryland state bar and the District of Columbia bar since 1997.  Since 1997, Mr. Sanford has been a member in good standing of the William B. Bryant Inn of Court in Washington, D.C.  Mr. Sanford is an "AV" rated attorney.

84.      From its formation in 2004, the law firm of Sanford Wittels & Heisler, LLP ("SW&H") has been and is significantly involved in civil rights and employment class action litigation, including numerous wage and hour cases.  The firm is "AV" rated. David Sanford has served as lead counsel in approximately 50 class actions around the United States, generating millions of dollars in recoveries to class members.  From 1981, Jeremy Heisler has been involved in a wide variety of class action litigations and has prosecuted over 50 class action suits, winning substantial recoveries for class members. Steven Wittels has served as lead counsel in approximately 50 class actions around the United States, generating millions of dollars in recoveries to class members.

**C.**     **Counsel's Current Rates are Consistent with their Qualifications and Experience and with the Marketplace, and Have Been Consistently Awarded by this Court and Other Courts in Similar Actions**

85.     Current hourly rates for the three partners of Sanford Wittels & Heisler, LLP who handled the litigation are as follows:

    a.   Jeremy Heisler - $650

    b.   Steven Wittels - $625

    c.   David Sanford- $600[10]

86.     In a recent judgment, <u>Binetti v. Washington Mutual Bank</u>, No. 06 Civ. 1732 (KMK) (S.D.N.Y. Apr. 15, 2008), this Court approved a fee application by Mssrs. Heisler and Wittels based on these same rates.

87.     Moreover, in a judgment handed down by the Northern District of New York in April 2007, <u>Murphy v. Super Steel Schenectady, Inc.</u>, 06-cv-0480 (Gary L. Sharpe, J.), the court approved similar hourly rates for Messrs. Heisler, Wittels, and Sanford for settlement of a racial discrimination employment class action.  In a further judgment in January 2008, <u>Rosenberg v. IKON</u>, No. 05-cv-09131-PAC, Judge Paul Crotty of this District approved a fee application by Messrs. Heisler, Wittels, and Sanford that relied upon similar rates.

88.     In <u>Brody v. Catell</u>, 2007 N.Y, Misc. Lexis 4647 (Sup. Ct. Kings Co. 2007), Justice Demarest approved a $350,000 legal fee to plaintiff's attorneys, Weiss & Lurie, notwithstanding that the <u>Brody</u> suit achieved only equitable and no monetary relief.  The Court utilized, <u>inter alia</u>, the following hourly rates for Weiss & Lurie, plaintiff's New York based counsel:

**<u>Brody v. Catell, Index No. 008835/2006 (Supr. Ct. Kings Co.)</u>**

**<u>Weiss & Lurie</u>**

**<u>Time Report from Inception to April 12, 2007</u>**

---

[10] Current hourly rates for the two partners of Madsen, Prestley & Parentau, LLC who assisted with this litigation are $600 for Peter B. Prestley and $575 for William G. Madsen.

P=Partner; A=Associate; PL=Paralegal

| NAME | STATUS | HOURLY RATE | HOURS | TOTAL LODESTAR |
|------|--------|-------------|-------|----------------|
| Joseph A. Weiss | P | $745.00 | 126.75 | $94,428.75 |
| James E. Tullman | A | $610.00 | 27.75 | $16,622.50 |
| Mark D. Smilow | A | $595.00 | 272.75 | $162,286.25 |

(Attached to Memorandum of Law as Exhibit 1)

### D.   The Fee Application is Reasonable and Justified Under the Facts and Circumstances of this Case

89.     Consideration of the specific factors weighed by courts in this Circuit in considering fee requests in similar cases counsels in favor of granting the requested fee.

90.     *First*, the Settlement clearly confers substantial benefits on members of the Settlement Classes.

91.     The benefits of the Settlement were achieved in the face of significant litigation risks and without the expense and burden of lengthy trial and appellate proceedings.  Settlement Class counsel thoroughly and carefully assessed the litigation and collection risks in this case.  We therefore negotiated a Settlement that maximized the Class' recovery and preserved Class resources that might otherwise have been wasted on the prosecution of uncertain claims and lost to the Class.

92.     *Second*, society has an interest in encouraging such actions and in vindicating the rights of claimants who would not have the financial wherewithal to bring individual actions, given that the prosecution of wage and hour claims involving relatively small individual damages is not economical.  This is particularly true in this case given the complexity of the allegations, the significant and substantive legal issues involved, and the detailed expert analysis required to establish both liability and damages.  As the Federal Rules and the courts universally recognize, it is good public policy to encourage litigation that aggregates claims that, but for the class action device, might never have been brought.

24

93.    *Third*, the fact that Settlement Class counsel undertook this case on a contingent fee basis argues strongly for approving the requested fee.  Counsel undertook this case without any assurance whatsoever that they would ever be paid, or compensated for the expenses they had to advance to prosecute the case.

94.    *Fourth*, Class Counsel has rendered valuable services to the class.  Class Counsel engaged in substantial factual, statistical and legal investigation and analysis to determine the strengths and weaknesses of the claims in the Class Action Complaint.  The hard-fought and ultimately successful settlement negotiations conducted by Class counsel achieved a substantial benefit for the Settlement Classes.  Counsel determined that this Settlement is in the best interests of the Classes and is the most efficient and risk-free method to achieve a substantial recovery on the claims asserted on their behalf.

95.    The favorable response of Plaintiffs and the class suggests their concurrence – both in regard to the settlement itself and the efforts and services of Counsel.  The terms of the settlement were clearly spelled out in the mailed notice to class members, with individual class members receiving a personalized estimate of their particular settlement benefit should they opt to send in a claim form.  Further, all class members were provided a pre-paid, return address envelope to mail in their claim forms; and despite almost 3,000 incoming claim forms there were no objections.

96.    *Fifth*, the issues in this case are complex.  Preparing the Class Action Complaints required Class Counsel to analyze numerous complex legal and factual issues.  Preparation of the mediation statement, analysis of potential damages, and consultation with experts demanded that Plaintiff's Counsel exercise their experience, skill, and creativity to the maximum extent.  The factual and legal complexities of this case warrant an award of the requested fee both because Class Counsel should be rewarded for having to address the many complex issues this case has posed, and for saving the Court and the parties the burden and cost of having to litigate these questions to conclusion.

97.     *Sixth*, the expertise, experience, and conduct of Class Counsel during this litigation also warrant an award of the requested fee.  Class Counsel are experienced in the conduct of class action litigation, and their litigation expertise is evident in the result obtained in this case, which, as discussed above, confers substantial benefits on the Settlement Classes in the face of significant litigation risks. Class Counsel have conducted themselves ably and professionally throughout this litigation and have served the interests of the Class to the best of their abilities.

E.     **Plaintiffs are Entitled to Reimbursement of Their Litigation Expenses**

98.     Plaintiffs expenses totaled $694,465.97 to prosecute this suit and, and these expenses require reimbursement from the settlement fund.  This amount includes the fees for the professional mediator, Judge Politan, as well as the cost of retaining accounting and wage and hour experts.  (The expenses will be reimbursed out of the Maximum Gross Settlement Amount and will be paid to Class Counsel and/or directly to the providers, as designated in attached Exhibit 12)

VI.     **Reasons for Granting the Incentive Payment Requests**

99.     The Settlement Agreement provides also for service payments in the aggregate amount of $400,000 for the sixteen Named Plaintiffs as well as thirty-nine opt-in plaintiffs and other class members who were interviewed by Defendants or prepared for such interviews or provided sworn declarations.  Individual service payments – tailored to the applicant's role in the litigation – are relatively low, mostly below $5,000, and do not exceed $25,000.

100.     These service payments are strongly supported by public policy and have been typically endorsed by courts as an incentive for employee-plaintiffs to incur the risks of pursuing litigation against an employer and as compensation for services rendered to the class.  (See Memo of Law, Point III)  Without the efforts and sacrifices of the Named Plaintiffs and other class members receiving proposed awards, this case may never have been brought or have achieved the successful result heralded by the class.

101.     The risks associated with pursuing this litigation were heightened in this case

because the class members largely reside in locations where C&S is the primary employer or has significant connections within a limited and insular business community.

102.    The collective incentive payments represent less than three percent of the Maximum Gross Settlement Amount and do not significantly reduce the monetary relief available to the class; nor do they substantially affect the awards to individual class members.  This litigation and the efforts of the persons receiving service awards also resulted in comprehensive prospective measures benefiting all class members still employed by C&S.

103.    No class member has objected to the proposed incentive payments despite their prominent disclosure in the written notice provided to the class.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:        New York, New York
                 July 21, 2008

Steven L. Wittels (SW-8110)

Jeremy Heisler (JH-0145)

**Sanford Wittels & Heisler, LLP**
950 Third Avenue, 10th Floor
New York, New York 10022
(646) 723-2947

David W. Sanford (D.C. Bar No. 457933)

**Sanford Wittels & Heisler, LLP**
1666 Connecticut Ave., NW
Suite 310
Washington, D.C. 20009

*Lead Counsel for Plaintiffs and the Class*

27